The present appeal is from the judgment of the Supreme Court, at general term, upon a case agreed upon by the parties, pursuant to the 372d section of the Code of Procedure. The controversy relates to the assessment of certain taxes upon lands comprised in Indian reservations in the counties of Erie and Cattaraugus, alleged to be illegal, and to sales *Page 422 
made by the Comptroller for the collection of these taxes. The assessments were made under special acts of the legislature, and, as to a portion of them, under the general laws of the State.
By a statute passed in 1841, the Board of Supervisors of Erie county were authorized to appoint commissioners to lay out and construct roads across the Buffalo creek reservation, which lies wholly in that county, and across a portion of the Cattaraugus reservation, which is partly in that county and in part in Cattaraugus and Chautauqua. The Board of Supervisors of Cattaraugus county were in like manner authorized to appoint commissioners to lay out roads in the Allegany reservation, the whole of which is in the last mentioned county, and in that part of the Cattaraugus reservation which lies in the same county. The expense of making these roads and of the necessary bridges, and of repairing them, and of repairing other roads and bridges on the said Indian lands, was to be defrayed by taxes to be laid on the reservations, in the year 1841 and in the two following years. The Supervisors of Erie county were authorized during those years to assess an amount not exceeding $5,000 per annum, on the land in the Buffalo creek reservation, and not exceeding $4,000 per annum on that of the Cattaraugus reservation lying in that county; and the Supervisors of Cattaraugus were allowed to assess not exceeding $4,000 per annum on the Allegany reservation, and not more than $1,000 per annum on the part of the Cattaraugus reservation lying in that county. Taxes were annually assessed in each of those years, to the maximum amount mentioned, in each county. (Laws, 1841, ch. 166.) It was also provided in the act that, if these taxes should remain unpaid for two years, the Comptroller should advertise and sell the lands in the manner provided by law; but it was added that no sale for the purpose of collecting them should in any manner affect the right of the Indians to occupy said lands.
The general objection to this taxation arises out of the fact that it is laid, as alleged, upon lands belonging to the Seneca nation of Indians. There is no doubt that, prior to the year *Page 423 
1838, the three reservations which have been mentioned, and also the Tonawanda reservation, lying in Erie and Genesee counties, were in the actual possession of this Indian tribe; and I can see no reason to question that these Indians were the owners of the land embraced in the reservations, as fully as it is possible for the native tribes to own lands in this State. The nature of the aboriginal title, and that of the State in which the lands lie, has been so often defined by judicial determination that no time need now be spent upon it. (Johnson v. McIntosh, 8 Wheat., 543; Fellows v. Ellsworth, 6 Hill, 546; S.C., 5 Denio, 528.) The Indian nation, in a collective or national capacity, has the right of occupancy of the land, but no power to sell or in any way dispose of it to others, except to the State, or to persons authorized by it to purchase; and the government of the State has the ultimate right of soil, or title in fee simple, subject to the Indian right of occupancy. The right to purchase the Indian claim, or, in the language usually employed, to extinguish the Indian title, thus existing in the State or in its grantees, is usually called the right of preëmption. This right of preëmption, as to these reservations, resided in the State of New York, in the year 1786; but the State of Massachusetts set up a claim, to the effect that the western part of this State, including the reservations in question, was covered by the charter of that Colony, which, it was insisted, extended its territory quite across the continent to the Pacific ocean. The parties were proceeding to litigate this question before the Congress of the Confederation, when a compromise was entered into, under the authority of the legislatures of the respective States, by which the State of Massachusetts was to relinquish all pretension to political jurisdiction, and New York was to convey to the State of Massachusetts all its proprietary interest in the land. This arrangement was formally executed by an instrument called a compact, dated December 16th, 1786, signed by commissioners appointed by the respective parties, and confirmed and ratified by the legislatures of both States. The words of conveyance on the part of this State are as follows: "The State of New York doth *Page 424 
hereby cede, grant, release and confirm to the said Commonwealth of Massachusetts, and to the use of the Commonwealth, their grantees, and heirs and assigns of such grantees forever, the right of preeumlmption of the soil from the native Indians, and all other the estate, right, title and property (the right and title of government, sovereignty and jurisdiction excepted), which the State of New York hath of, in and to" the contested territory, embracing, as has been mentioned, all the Indian reservations. This instrument contained an agreement respecting the taxation of the lands, upon which one of the questions to be determined arises. It is as follows: "The said commissioners have agreed that the lands so ceded, granted, released and confirmed to the Commonwealth of Massachusetts, or such part thereof as shall from time to time be and remain the property of the Commonwealth of Massachusetts, shall, during the time that the same shall so be and remain such property, be free and exempt from all taxes whatsoever; and that no general or State tax shall be charged on or collected from the lands thereafter to be granted by the Commonwealth of Massachusetts, or on the occupants or proprietors of such lands, until fifteen years after such confirmation as is hereinafter mentioned, of such grants, shall have expired; but that the lands so to be granted, and the occupants thereof, shall, during the said period, be subject to town and county charges or taxes only." It was agreed, in a subsequent part of the instrument, that grants by the State of Massachusetts to others, of the right to acquire the Indian title to any of these lands, should be confirmed by the legislature of that State, and that copies of the grants and of the acts of confirmation should be deposited in the office of the Secretary of the State of New York. In the year 1791, the State of Massachusetts conveyed to Robert Morris the preeumlmption right which was vested in that State, and all of its right, title and interest in the lands in question.
I do not perceive, from the printed argument which has been submitted by the respondents' counsel, that it is maintained that there has been any violation of the first branch of the provision, namely, the part which precludes taxation under *Page 425 
the laws of New York, while the lands shall remain the property of the State of Massachusetts; and it is quite clear that the provision, in that aspect of it, became inoperative immediately upon the sale and conveyance to Morris; but it is earnestly insisted that the imposing of the taxes in question constitutes a breach of the last branch of the covenant, which forbids the levying of "a general or State tax" upon such of these lands as should be granted by the State of Massachusetts, until after fifteen years had elapsed from the time such grants had been confirmed by the legislature. If a tax of the character mentioned, that is, a general tax, had been laid, a question would arise whether the grants spoken of embraced such grants as might be made by Massachusetts of the preemption rights which had been granted by New York, or whether grants which should carry with them a title to the actual occupation, and a lapse of fifteen years after their confirmation, were not required before a right to levy such a tax would accrue, according to the true construction of the agreement. We do not think it necessary to decide this question; for we are of opinion that none of the taxes under consideration come within the denomination of general or State taxes, according to the meaning of these terms in the instrument. Unless the taxes assessed under the act of 1841 are within the prohibition, it is not contended that any of the others are. It is argued that the distinction established by the agreement is between such public burdens as are ordinarily imposed by the standing laws of the State for town and county purposes, on the one hand, and extraordinary levies authorized under special acts of the legislature for peculiar and exceptional objects, on the other. The act of 1841, it is argued, is of the latter character; and it is claimed that the tax which it authorizes falls within the denomination of a State tax, rather than of a town or county charge or tax. But we are of the opinion that the true distinction is between taxes imposed for local purposes, as for objects which are usually provided for by town and county charges, and such taxes as are laid for the benefit of the whole State, and are levied upon all the property of the State alike. Tested *Page 426 
by this rule, the tax imposed under the statute in question was not a general or State tax. The duty of constructing roads, highways and bridges has generally been imposed upon the counties and towns; and the expense of such works has always formed a considerable proportion of the aggregate of the town and county charges. Occasionally a State-road has, on account of its extent and general usefulness, been authorized by the legislature, and the expense made a general charge upon the resources of the State; but the other system is the one under which the branch of the public administration which concerns these subjects has been usually carried on. The apparent motive for the distinction contained in the agreement, would lead to the same construction. The commissioners of New York, and the legislature which appointed them and confirmed their acts, may be supposed to have had in view the settlement and improvement of that part of the State in which these reservations were situated, which, at the date of the compact, was an unsettled wilderness. While the title continued in the State of Massachusetts, the region would of course remain unsettled, and would not require expenditures for roads and bridges; but when that State should grant the lands, and especially when the Indian title should be extinguished, and the occupation of the savages should yield to that of the white settlers, it would be very essential that the means of travel, transportation and intercourse should be provided. Public contributions for such purposes could not well be intermitted for any length of time after the settlement should commence. The duty of contributing to general State purposes, though important, would be less pressing, and might be postponed for a limited time. Hence, the compact provided that no taxes of any kind should be levied while the lands continued to be owned in a mass by the State of Massachusetts, and that the settlers should be exempted for a few years from exactions for purposes in which they would have only a general and comparatively a remote interest, but should be left subject to taxation for objects of immediate and pressing necessity, and which, it was foreseen, would be essential to the progress of *Page 427 
the new settlements. We must, therefore hold that this particular objection to the tax in question cannot be sustained.
It is further argued that a law for taxing these reservations is inconsistent with the public guaranty contained in several treaties between the government of the United States and the Indian tribes, under which the latter retain the possession of the reservations. There are several treaties by which the Seneca nation of Indians are recognized as the lawful possessors of the lands embraced in these reservations. It will be sufficient to notice the one concluded at Canandaigua, on the 11th November, 1794. (U.S. Stat. at Large, vol. 7, p. 45.) It describes the lands of the Seneca nation by definite boundaries, which include all these reservations; and the United States, in express terms, acknowledge the land within these boundaries to be the property of the Seneca nation, and agree never to claim the same, or to disturb the said nation in the free use and enjoyment thereof. This, like all the other public treaties entered into by the United States, is parcel of the paramount law, and must prevail over all State laws in conflict with it. The guaranty of quiet enjoyment is not limited to disturbances by the United States government, but extends equally to the acts of the several States and of all the citizens of the Union. This results from the nature of the treaty-making power, and from the paramount authority which the Constitution attributes to Federal treaties when it declares them to be the supreme law of the land. A treaty concluded by the President and Senate binds the nation in the aggregate, and all its subordinate authorities, and its citizens as individuals, to the observance of the stipulations contained in it. The principle has been asserted and established by repeated decisions of the Supreme Court of the United States. (Ware v. Hilton, 3 Dall., 199; Worcester v. The State ofGeorgia, 6 Pet., 515.) This State was, therefore, precluded from passing any law which should disappoint or frustrate the guaranty afforded to the Seneca Indians by the treaty to which I have referred. Any act of the legislature, the execution of which would dispossess the Indians of the reservations, or any part of them, or which *Page 428 
should materially disturb their occupancy, would therefore be illegal. But we do not perceive that the statute of 1841 could have any such operation. Although it is declared that, in case of the non-payment of the taxes, the Comptroller is to proceed to advertise and sell the lands in the manner then provided by law, this is qualified, as we have seen, by the provision that no sale for the purpose of collecting the taxes shall in any manner affect the right of the Indians to occupy the lands. If the purchaser acquires no right to interfere with the Indian occupancy, the subject of his purchase is limited to the title of the grantees under the State of Massachusetts; and he acquires nothing more. This, we have seen, is the right of preëmption, and perhaps it embraces also a technical fee; but, as it does not embrace the Indian right of occupancy, but expressly excludes it, and that is the only right which the Indians had, it is clear that they are not prejudiced by the tax or by any sale which may take place pursuant to it. The title of the grantees under Massachusetts to these lands, before the extinguishment of the Indian title, subject as it was to the right of possession remaining in the Indians for an indefinite period, was not liable to taxation and sale under the general laws of the State relative to the assessment of taxes. But it was in the power of the legislature to subject such an interest to the burden of taxation, provided it could be done without affecting the rights secured to the Indians by their treaties with the national government. If we are right in what has been said as to the effect of a sale, there can be no pretense that the Indian title would, in any way, be prejudiced by it. Our conclusion, then, upon this part of the case, is, that the act of 1841 is not invalid on account of any conflict between it and the treaties which have been referred to.
The objection arising out of the act of Congress to regulate intercourse with the Indian tribes, admits of substantially the same answer which has been given to the foregoing. (4 Story's Laws U.S., 2394.) The act relates, for the most part, to the territory set apart for the occupancy of the Indians on the Mississippi river, and not within the boundaries of any *Page 429 
State; but certain sections apply to the lands of any Indian tribe with which the United States have treaties. By these provisions it is forbidden to any person to settle upon or to survey or allot any of the Indian lands referred to, or to acquire their title by grant or otherwise, without the authority of the United States. (§§ 11, 12.) It is quite plain that a purchaser under a sale for the non-payment of taxes, under the act of 1841, would not acquire the authority of this State to do any of the acts thus forbidden by the act of Congress.
It will now become necessary to state some circumstances, not already mentioned, upon which other parts of the relief claimed depend. There was an act of the legislature, passed in 1840 (ch. 254), authorizing the respective Boards of Supervisors of Allegany, Erie, Chautauqua and Cattaraugus to assess the lands included in the Indian reservations within their districts for such sums as they should consider reasonable to put the highways and bridges in said reservation in repair; the burdens thus imposed to be in proportion to those laid on other lands of equal value in the same towns. The amount raised was, as I understand the act, to be apportioned among the overseers and commissioners of highways of the towns according to the discretion of the Supervisors. In other respects, the Revised Statutes respecting highways and bridges were to apply to the assessment of these taxes and the expending of the moneys raised. Under this act, assessments were made in Cattaraugus county upon certain large parcels of land in the Allegany and in the Cattaraugus reservations, and taxes imposed thereon for the repairs of highways: the method apparently being to assess for the benefit of each town in which any part of the reservation was situated, the portion of the reservation lying therein in gross. These assessments were made in the same years mentioned in the act of 1841, or in some of these years; the course varying in this respect in the different towns. In the same years, or in some of them, the same parcels of these two reservations were assessed for town and county charges in several of the towns in the county of Cattaraugus. These last mentioned assessments appear to have been made in the ordinary *Page 430 
manner prescribed by law, and they derive no support from any special statute. All the taxes upon lands in the Allegany and Cattaraugus reservations thus imposed, including those under the act of 1841, were returned to the Comptroller, under the general provisions of the statutes, as unpaid taxes, and were advertised for sale by him, and were, with other lands, to be afterwards mentioned, sold in parcels as they had been returned, at the sale for taxes in the year 1859, and were purchased on behalf of the State, for the want of other bidders. The purchases thus made have been assigned to the defendant, Thomas W. Olcott.
The counsel for the respondents very properly concede that this sale, in respect to the several parcels of land in the Allegany and Cattaraugus reservations, cannot be sustained. The rights of the Indian occupants were in no manner reserved, either in the form of the sale or in the acts of the legislature by which the taxes were imposed, except as to those under the act of 1841, or in the laws under which that sale took place. If the transaction is held to be valid according to its purport, the Indian right of occupancy would be subverted, and the purchaser, after the time for redemption had elapsed, would be entitled to a conveyance which would vest in him an absolute estate in fee simple. (Laws of 1855, ch. 427, § 63.) The judgment appealed from must, therefore, be so modified as to set aside, and declare null and void, the above mentioned sale as to all the land included in the two Indian reservations last above mentioned; but it must, at the same time, be declared that the assessments and the taxes imposed under the act of 1841 were valid charges against the interest of the grantees of the State of Massachusetts in these lands.
The assessments under the act of 1840, and the taxes imposed pursuant thereto, and also the taxes for town and county charges imposed under the general provisions of the Revised Statutes, must also be adjudged illegal. If these taxes were of any validity, they were a charge upon the land assessed, and that land was liable to be sold for the purpose of raising the amount of the tax. There being no saving of the rights *Page 431 
of the Indians, the inevitable consequence of holding the taxes to be valid would be that the whole tribe might be dispossessed by the purchaser at the Comptroller's sale. The reasoning upon which it has been shown that the sale actually made was void, equally proves that these taxes were illegally imposed. Such taxes were inconsistent with the policy which this State has always observed towards the Indian tribes residing on their reservations within this State. Each of the three Constitutions successively adopted by the people of the State has contained a provision like that in the first Constitution, which was in these words: "No contracts or purchases for the sale of lands made since the 14th day of October, A.D. 1775, or which may be hereafter made with or of said Indians, within the limits of this State, shall be binding on the said Indians, or be deemed valid, unless made under the authority and with the consent of the legislature of this State." (Const. of 1777, art. 37; id., 1822, art. 7, § 12; id., 1846, art. 1, § 16.) This alone would go far to show that their lands were not to be subjected to the burdens imposed upon the lands of citizens, for, without ability to sell, it might often happen that it would be impossible for them to raise the money necessary to pay their taxes. It would be quite inconsistent with principle to allow all the lands of these people to be taken from them and sold to strangers, under the silent operation of general laws, while the sanction of the legislature, passing upon the actual transaction, is required to a valid alienation of the smallest parcel. In accordance with this constitutional inhibition, there are laws for the prevention of intrusions upon Indian lands, and to prevent trespasses upon them, all of which indicate a persistent intention to separate the Indian tribes from the other population of the State, and to allow them to govern themselves according to laws and usages of their own. Chancellor KENT expressed the view which our laws take of their position, in giving his opinion in Goodell v.Jackson (20 John., 693). "In my view of the subject," he said, "they have never been regarded as citizens or members of our body politic, within the contemplation of the Constitution. They have always been and are still considered by our *Page 432 
laws as dependent tribes, governed by their own usages and chiefs, but placed under our protection and subject to our coercion, so far as the public safety requires it, and no further." They have never been considered as embraced within the administrative arrangements of towns and counties; and it is not denied, in the brief on behalf of the respondents, that the taxes now under consideration were the first which had ever been imposed upon the Seneca Indians or upon their lands. So far as the policy of considering the Indians as separate communities is deducible from the constitutional provision which has been referred to, it was, of course, incapable of being subverted by the legislature; but to the extent that it was based upon statute law, it was, no doubt, liable to be changed by later statutes. But the assessments for town and county charges rest on no fresh enactments; and a judgment which should uphold them would form a precedent upon which the native tribes, living as they do on their reservations and constituting distinct and separate communities, would be subjected to all the provisions of our general statutes for the support of the poor, for defraying the expenses of criminal justice, for regulating descents and distributions, and the like. Independently, therefore, of the effect of the treaties which the United States have entered into with these tribes, I am of opinion that the assessments for town and county charges are illegal under our laws, for the reason that those laws never extended to the assessment of taxes upon lands in the Indian reservations. The act of 1840, though it would operate as a reversal of the established policy of the State upon this subject, would have been within the scope of the legislative authority but for its effect to destroy the guaranty afforded to the Indians by the treaties which the general government have made with them.
I have thus far spoken of the Allegany and Cattaraugus tracts as Indian reservations, to which the aboriginal title had not been extinguished; and it now becomes necessary to refer to certain transactions relating to that title upon which some further questions arise. On the 15th January, 1838, a treaty was concluded between the United States and the several tribes *Page 433 
of New York Indians, including, of course, the Senecas. The substance of the treaty was, that the United States should provide lands for these Indians in the Indian territory on the Mississippi river, and that they should remove thither in five years. At the same time, Messrs. Ogden Fellows, who held the title to the four reservations under the grant executed by the State of Massachusetts, treated with the Senecas for the purchase of their title to these reservations, and received a conveyance of them from their chiefs and head-men. The deed was expressed to be in consideration of $202,000 paid, and was absolute in its terms. It was approved by a commissioner of the United States, who negotiated the principal treaty, and by a superintendent on the part of the State of Massachusetts. This conveyance was appended to the principal treaty, and was recognized by its tenth article, by which the United States agreed to receive the consideration mentioned in it as the trustees for the Indians and dispose of it for their benefit in the manner therein mentioned. On the 20th May, 1842, another treaty was concluded between the United States and the Seneca nation, approving of a new arrangement between the Indians and Ogden Fellows; which new contract was embraced in a written instrument executed at the same time between them and embodied in the treaty. It recited the conveyance of 1838, and that differences had arisen between the parties respecting it, and that its provisions remained unexecuted. It was thereupon agreed that the Indians should retain their rights in the Allegany and Cattaraugus reservations; but they again granted and confirmed to Ogden Fellows the Buffalo creek and Tonawanda reservations, the aggregate consideration to be paid them being reduced, and to be determined as to certain particulars by arbitrators. By the terms of this treaty, the United States consented to the new arrangement, and agreed to receive and apply the moneys according to certain provisions contained in the indenture; and the State of Massachusetts also approved the treaty, and confirmed the conveyance according to the provisions of the compact. The award of the arbitrators respecting the consideration to be paid for the two reservations *Page 434 
retained by Ogden Fellows was filed on the 1st April, 1844. The Indians have never removed from the Allegany or Cattaraugus tracts, nor did Ogden Fellows, or their grantees, ever take any possession of them. It is to be inferred from statements in the case, though they are not perfectly explicit, that the Indians removed from the Buffalo creek reservation about May 1, 1844, and that persons claiming under Ogden Fellows took possession. Besides the assessment of the $5,000 per annum upon this tract by the Board of Supervisors of Erie county for three years, according to the act of 1841, assessments for highways and for ordinary town and county charges were made and taxes imposed by the Board during the same years, in substantially the same manner as in the case of the other two reservations by the Supervisors of Cattaraugus county.
It will be perceived, from what has been said, that we do not consider the interruption of the continuity of the Indian title to the Allegany and Cattaraugus tracts, from 1838 to 1842, as of any legal consequence. The Indians were never out of possession, and the time had not arrived when they were required to remove to their new homes on the Mississippi, according to the treaty made simultaneously with the execution of the conveyance. When the conveyance of 1838 came to be revoked by the last-mentioned treaty, the reservations had not ceased to be Indian reservations. I should, perhaps, have thought differently of this, individually, except for the judgment of this court in ThePeople v. Dibble (16 N.Y., 203), which was affirmed by the Supreme Court of the United States. (21 How., 366.) That case, which related to the Tonawanda reservation, determined that, notwithstanding the deeds of 1838 and 1842, by both of which that tract was conveyed to Ogden Fellows, and although the grantees of these purchasers had taken peaceable possession of and removed on to portions of the tract, yet that while the Indians continued, in their national character, to reside upon the reservation, the white purchasers were liable to be removed by summary process under a statute of this State, as intruders upon Indian lands. This is certainly *Page 435 
much more than enough to show that the Allegany and Cattaraugus tracts had not ceased to be Indian reservations when, in 1842, and before there had been any change of possession, the purchase of the Indian title was rescinded by a treaty negotiated under the authority of the United States. This concludes all that it seems essential to say respecting these two tracts.
It is not necessary to add anything respecting the taxes imposed upon the Buffalo creek reservation, under the act of 1841. Having held such taxes to be legal, as to the tracts to which the Indian title has not been extinguished to this day, it follows, a fortiori, that they are unexceptionable as to the tract now in question, which had been conveyed by the Indians when the taxes were laid, and has since come into the full possession of the grantees.
The taxes for highways and for town and county charges, upon this reservation, under the general statutes, and under the act of 1840, require a different consideration. When they were laid, the Indian tribe was occupying the land, though they had conveyed it. There is great plausibility in the argument that, inasmuch as this occupancy has been held to be of such a character as that the laws against intrusions upon Indian lands continued to apply, it would be inconsistent not to consider the treaties by which the Indian occupancy was guaranteed also applicable. If the occupancy was lawful, and the Indians were entitled to the protection of the State laws against intrusions upon the reservation by white people, how, it may be said, can they be turned out, by force of a tax sale, consistently with the principles which we have applied to the other reservations? The answer is this: Though the Indian occupancy was lawful at the time the taxes were assessed, yet it was under a title not implying ownership, but only temporary in its character, and which could not, in contemplation of law, continue beyond the time when the Indians had agreed to remove west. This period would be reached in about three years from the time the first tax was assessed, and before any purchaser at a sale for non-payment *Page 436 
of the tax would be entitled to the possession. The grantees occupied the position of absolute owners of the land, subject only to the right of other parties, not taxable, to occupy without rent, for the short period mentioned. The Revised Statutes, as originally enacted, did not apply to such a case. It was declared that every person should be assessed in the town or ward where he should reside, for all lands then owned by him in such town or ward, and occupied by him, or wholly unoccupied; and so where a person living in the town or ward where the lands owned by him lie, but which should be occupied by another person, the assessment was to be upon the owner or occupant; and unoccupied lands, where the owner did not reside in the town or ward, were to be assessed as the lands of non-residents. (1 R.S., 389, §§ 1, 2, 3.) The case of an owner living in a different town from that in which the lands were, and where the lands were actually occupied by another person, was not within any of these provisions; but the omission was supplied by an amendment, adopted in 1850, by which the section 2 above mentioned was altered so as to read thus: "Land occupied by a person other than the owner may be assessed to the owner or occupant, or as non-resident lands." (Laws of 1851, ch. 176, § 1.) But the assessment in question was made before this amendment was enacted. Still, I am of opinion that the tract, considering the Indian title as having been extinguished by the treaty, might properly be assessed as non-resident lands in 1840, notwithstanding the holding over of the Seneca Indians. The occupancy spoken of in the statute refers to the possession of some individual or individuals, who might themselves be taxed in respect to the land. The Seneca nation occupied the Buffalo creek reservation as a community, in part for tillage and in part for hunting grounds. Large portions of it were, doubtless, in the sense of the statute, unoccupied. Then, neither the Indian tribe nor the individual Indians were liable to be taxed, either as owners or occupants. Their possession, such as it was, did not answer any of the purposes of the occupancy referred to in the act. For these reasons we hold that the land was properly assessed, though *Page 437 
the Indians remained upon it for a temporary purpose, preparatory to their removal west.
The remaining question is, whether the sale by the Comptroller of the land in this reservation was regularly made.
It appears that at some time, not stated, the Buffalo creek reservation was surveyed and divided into four hundred and ninety-three lots. It seems probable that this was done after the treaty of 1838, and prior to the assessments of 1842; for that is the first year in which there is any reference to lots in any of the assessments. The assessment of the $5,000 for the three years mentioned is upon the whole reservation. The assessments for town and county charges are, for the most part, upon those parcels of the tract lying respectively in the several towns for which the assessments were made; though, in some instances, the lots are separately assessed. In the year 1844, and subsequently, taxes were regularly assessed on many of the lots separately. Returns having been made to the Comptroller in respect to all these taxes, he proceeded to advertise the lands for sale in the year 1859, as four hundred and ninety-three separate lots in a certain survey. Before the sale he had apportioned the taxes on each of the lots, and entered the same in his books. This seems to have been done whenever the whole reservation, or portions of it, other than separate lots, had been assessed in gross, by averaging the burden according to the quantity of land in each lot. At the sale, each lot was put up for the aggregate amount with which it was thus made chargeable, including the cases in which there had been distinct assessments on each lot, and including also the taxes assessed subsequently to 1843. The greater part of the lots were, for default of other bidders, struck off to the State, and nearly all the purchases have been assigned to Thomas W. Olcott. The alleged illegality consists in apportioning the taxes among the lots in the manner which has been mentioned, the appellants insisting that the sale should have taken place according to the parcels specified in the several assessments, without any apportionment. *Page 438 
The general tenor of the detailed provisions for the assessment, return, advertising and sale of non-resident lands for taxes would carry the idea that the description first given in making the assessment was to be followed throughout, though this is not said in terms. But it would be extremely difficult, if not wholly impracticable, to apply this rule under such circumstances as those here presented. A tract of about fifty thousand acres is assessed for a large amount in gross; then parcels of the same tract containing six thousand, eight thousand, nine thousand, and ten thousand, are separately assessed; then the whole is divided into nearly five hundred lots, and each lot is separately assessed; it may be for unequal sums. No single sale of each parcel would operate justly, unless it could be first ascertained what portion of the whole burden such parcel ought to bear. We are of opinion that the statute contains principles which may be applied to the case, and which justify the course which has been pursued. I refer to section 47 of the title relating to the collection of taxes, c. (1 R.S., 406), which provides that "whenever a sum in gross is assessed upon any tract, c., of land, any person claiming a divided or undivided part thereof may pay to the Treasurer any part of the tax, interest and charges thereon, proportionate to the number of acres claimed by him, on the certificate of the Comptroller; and the remaining tax, interest and charges shall be a lien on the residue of the land only." The next section provides that, of the tract so subdivided, the person wishing to pay the tax upon a divided part of it shall deliver to the Comptroller a map of "the subdivision, if required by him." (§ 28.) This provision allows the public officers to assume, for the purpose of receiving payment of taxes, that every acre of a tract of land assessed in gross is equal in value to every other acre. In many cases, doubtless, the fact would be otherwise; but the legislature looked to the practical working of the machinery they were organizing, and, as it seems to us, they determined upon the principle that every part of a tract assessed was to be considered equally valuable. They did not, in terms, apply the rule to the case now before us; but, if it was not *Page 439 
unjust to resort to it in the case of a voluntary payment by a part owner of a parcel of land assessed in gross, it would be equally fair to make use of it when the land came to be sold. If the apportionment to the several lots could not be made in this case, it would be equally impossible to do it if it were shown that each lot had a separate owner. If there were no other way than to sell the tract in gross in such a case, it would inevitably happen that the whole of some of the lots would be sold to pay the incumbrance resting equally upon all, while the others would be left untouched, and would be discharged from the lien. We are of opinion, therefore, that the sale which was made of this reservation was valid.
The judgment of the Supreme Court, holding that the plaintiffs were not entitled to relief upon any part of the case, must be reversed, and judgment must be given in accordance with this opinion, without costs to either party in this court. Should the counsel fail to agree upon the language of the judgment to be entered, it will be settled by the judge by whom the opinion has been prepared.
All the judges concurring,
Judgment reversed.