OPINION OF THE COURT
Rose H. Sconiers, J.
The aforecaptioned matters were brought before this court by order to show cause. Because of common issues of law and fact, both matters were reviewed at oral argument and will be addressed herein.
In each case, petitioner New York State Department of Taxation and Finance seeks an order pursuant to Tax Law § 848 confirming the temporary seizure of a tractor and tanker and its on-board cargo of gasoline. These seizures, petitioner maintains, were carried out under the State statutory scheme "aimed at stanching the flow of bootleg motor fuel into New York State, that is fuel imported, distributed and sold without payment of State excise and prepaid sales taxes.” (L 1985, ch 44.)
Documents in the possession of the operators indicated that the gasoline belonged to a Mohawk Indian retailer and was consigned to Indian retailers on the Seneca Nation of Indians’ Cattaraugus Reservation. State-mandated registrations and manifests were not, however, being carried and each operator was issued an appearance ticket before the local court and each has indicated that they will defend and contest the charges against them.
In response, respondent owners and transporters assert that, while they were in the process of obtaining appropriate registrations, their actions in transporting the fuel in question was guileless, resulting from their having been otherwise informed that the tax status of the shipments was a matter between the Indian retailers and the State. Therefore, respondents maintain that these shipments were "performed within a commercial context in which there existed a complete lack of knowledge as to the ramifications of the transportation of motor fuel in New York without registration”. As a consequence, respondents, who claim to be losing $250 per day from this forfeiture, beg this court to exercise its discretion and release and return the seized vehicles and fuel, in the interest of justice.
In pressing its claims, petitioner urges that the court’s focus be narrowly directed to the respondent owners’ and transport *936 ers’ clear failure to comply with the statute (Tax Law § 1812 [a], [b], [d], [e]), and thus find that there exists a propriety to the seizures and a substantial probability of petitioner prevailing in a final forfeituré action.
This court, however, would be remiss if it did not consider the larger issue at hand, as asserted by those respondents that are Seneca Indian retailers on the Seneca Nation of Indians’ Cattaraugus Reservation. Of necessity then, the court must take note of ongoing events and circumstances which precipitated these seizures and which do not otherwise appear to be in dispute.
For the past dozen or so years, American Indian retailers doing business on the several New York reservations which comprise the Six Nations of the Iroquois Confederacy have enjoyed and profited from the sale of tax-free goods (principally gasoline and cigarettes) to Indians and non-Indian purchasers. It has been somewhat harshly suggested, by various courts of appellate review, that this competitive advantage is found in the ready willingness of the non-Indian purchasers to avoid their legal obligation to pay excise, value added and other taxes imposed by State taxing authority. Although such taxes are collected by the non-Indian retailer at the point of sale and later forwarded to the petitioner, Indian retailers, claiming a freedom from taxation and/or an immunity from the collection of taxes, have refused to collect and remit these taxes choosing, instead, to pass.the tax saving onto the purchaser.
As a consequence, New York State has embarked on a multipronged legislative and judicial effort to enforce its interest in collecting lawful taxes. One such effort was the taxing scheme now relied upon by petitioner and which placed the responsibility for payment of applicable taxes upon the initial importer, who must also be licensed by the Tax Department as a registered "Distributor”.
Since its enactment in 1985, however, these regulations were not applied upon the shipment of gasoline to Indian reservations. Rather, the State and representatives of the various tribes conducted on-and-off negotiations in the hope of bridging a compromise between the State’s interest in collecting taxes and the Six Indian Nations’ interest in preserving tribal sovereignty over their members and their territory.
Respondents Indian retailers insist, as they (and others similarly situate) have in all prior tax disputes, that they are members of the Seneca Nation of Indians, recognized by treaty to be a dependent yet sovereign Nation, with its own distinct *937 political community and designated (reservation) boundaries. As a result of those treaties and their vicarious status thereunder, respondents claim immunity from State taxes and the collection of those taxes from others doing business on reservation lands.
Respondents, therefore, invite this court to review their Nation’s prerevolution history, its relationships with competing European governments, its treaties with the emerging Federal and State governments and its long battle within the Federal and State judiciary. Throughout this long period, these Senecas, the Keepers of the Western Door, and tribal member of the Six Nations of the Iroquois Confederacy, maintain they have asserted their sovereign identity. Having never waged war with the United States Government and thus having never been conquered in battle, they have remained on their native land, relinquishing certain claims only by treaty with the United States Government and have staunchly defended their right to independence and freedom from operation of State laws. (Citing in part Treaty with Six Nations of Indians, Fort Stanwix, 7 US Stat 15 [1784]; Treaty with Six Nations of Indians, Fort Harmar, 7 US Stat 33 [1789]; Treaty with Six Nations of Indians, Canandaigua, 7 US Stat 44 [1794]; Treaty with Seneca Nation of Indians, Buffalo Creek, 7 US Stat 586 [1842]; McClanahan v Arizona State Tax Commn., 411 US 164 [1973]; Fellows v Denniston, 23 NY 420, revd sub nom. New York Indians, 5 Wall [72 US] 761 [1866]; Oklahoma Tax Commn. v United States, 319 US 598 [1943]; Squire v Capoeman, 351 US 1 [1956]; and distinguishing Moe v Salish & Kootenai Tribes, 425 US 463; Washington v Confederated Tribes, 447 US 134; Oklahoma Tax Commn. v Potawatomi Tribe, 498 US 505; 25 USC § 233; Indian Law § 6.)
Petitioner counters that such review is now a well-worn path and that higher legal authority has preempted further consideration, having decreed that New York’s interest in collecting its lawful taxes and in preventing tax evasion by non-Indians does not unnecessarily intrude on "core” tribal interests. Thus, State taxing regulations which seek to enforce their tax impact upon non-Indian purchasers by imposing the minimal burdens of a precollection regime upon Indian traders have already been found to be valid and enforceable. (Citing Department of Taxation & Fin. v Milhelm Attea & Bros., 512 US 61 [1994]; Snyder v Wetzler, 193 AD2d 329 [1993], affd 84 NY2d 941 [1994].)
Such argument is, of course, correct, insofar as it goes. But this court must also note, in passing, that in each judicial in *938 quiry relied upon by petitioner, those courts have sought to limit their reach to only the particular interest at stake therein and have avoided general pronouncements defining or limiting Indian sovereignty. Thus, for example, in Attea, the Supreme Court, noting that the specific tax regulations at issue (as they are in the instant matter) were designed only to ensure compliance by non-Indians who might otherwise evade lawful taxes by purchasing tax-exempt products, stated: "While the effect of the New York scheme on Indian retailers and consumers may be relevant to that inquiry, see Warren Trading Post, 380 U.S., at 691, this case does not require us to assess for all purposes each feature of New York’s tax enforcement scheme that might affect tribal self-government or federal authority over Indian affairs. Here we confront the narrower question whether the New York scheme is inconsistent with the Indian Trader Statutes.” (Supra, at 69-70.)
In Snyder, also relied heavily upon by the petitioner, while ruling that: "The United States Supreme Court has clearly established that State tax statutes requiring Indian retailers to collect and remit taxes on sales to non-Indian purchasers, and to keep the records necessary to ensure compliance, violate neither the Commerce Clause nor the constitutional proscription against direct taxation of Indians absent explicit congressional consent”, the Court of Appeals declined to review, as unpreserved, whether "the State tax statutes at issue violate either the Supremacy Clause or New York law”. (84 NY2d, at 942, supra.)
The court points this out because in fairness to the State, despite its apparent superior legal position, it has chosen to exercise restraint in the face of continued Indian objections over violations to their sovereignty interests. Thus, for many years the State has attempted to maintain a dialogue with Indian representatives in the search for some middle ground in this conflict between the application of State taxing powers and the semi-sovereign status of Indians doing business on tribal reservations.
This court must assume, therefore, that during this time State officers have been wrestling with the collective conscience of this State in the realization, that while judicial authority, by declaring valid those taxing statutes designed to capture taxes before the retail product reaches reservation lands, has thereby provided a narrowing construction of the scope and reach of Indian treaties, that, at the least, the spirit of those treaties is nonetheless violated. Hence, in declaring its intent *939 to enforce tax regulations upon shipments to Indian reservation retailers, petitioner, with one hand, has called upon its police and plenary power to enforce a virtual blockade upon roads leading to reservation land, while extending the other hand, in compromise. A compromise which, interestingly, now offers a waiver of enforcement of these tax statutes to select Indian merchants, whose tribal leaders have entered into "Indian Agreements”, so long as they agree not to sell gasoline; to raise prices on other products (principally cigarettes) to parity with neighboring non-Indian retailers; and to pass the tax saving differential on to the reservation as a whole. (See, New York State Tax Dept Notice N-97-4, Indian Agreements [Apr. 1997].)
It is thus clear, even to the casual observer, that the real interest underlying this recent extraordinary showing of the State’s police powers, is the desire, not to collect taxes, but rather to advance the commercial interest of "retail parity” and thereby defeat the previous competitive advantage of reservation sales.
This court is, therefore, struck by how little has changed for the Indian over the past century and a half and believes that to the Indian respondents herein, it owes a responsibility of more than a simple review of the applicable authority cited by petitioner and must, at the very minimum, acknowledge the underlying inequities of which they complain.
These respondents, as members of the Seneca Nation of Indians in their several legal encounters over the issue of taxation, have consistently argued that their tribe, in its many agreements and treaties with the Federal and State governments, has always retained its identity as a separate (sovereign) political unit, secure within its original, absolute and exclusive use of reservation lands. Having been so restricted to these lands as the sole remaining place where Indian culture and custom could be practiced; having persevered through poverty and prejudice, refusing to relinquish those small patches of land, reduced from what was once so much, but which still deeply embodies the Indian spirit and the Indian identity as a sovereign people; and having believed to have finally found a method whereby that land and the treaties upon which it was set aside could work to their economic gain; it must now seem to these Senecas that they are once again being told, that what appeared to have been an unbreachable allodial right in and upon their reservation land was, on further review, only so much smoke in the wind.
Thus, respondents ask: Is not the petitioner seeking to impose the will of non-Indian retailers over their Indian *940 counterparts through the coercion of State tax laws to compel entry into price parity agreements which will surely mean the end to most Indian retail businesses? Is not this "Indian Agreement”, now pressed by petitioner upon the Six Nations, only serving to divide one tribe against another? Does not this "Indian Agreement” remove the only economic advantage to reservation status that has ever been enjoyed by Indians? Does not this "Indian Agreement”, once the special interests of retail parity are realized, again promise freedom from the imposition and collection of taxes, the very thing the Indians have argued they were entitled to all along? Does not this "Indian Agreement” impose through economic coercion, a change in the cultural fabric of reservation Indians by permitting tax-free status to only certain designated tribal members and mandating a socialistic sharing of certain benefits? Perhaps so.
However, these issues only point up to the court the continuing need for State officers and Indian representatives to find that area of compromise which better articulates the over-all status of Indian "sovereignty”, as it is to be understood between this State and the tribal reservations within its boundaries. That search, to be successful, cannot start while State Police Troopers and Indian activists continue to confront each other at the edge of reservation lands.
The integrity of any system of taxation is grounded in the premise that all similarly situated taxpayers pay the same share of the tax burden. Here, however, rather than applying its taxing powers uniformly over its citizens, this court believes that the petitioner, without legislative authority to do so, has arbitrarily forfeited its very taxing power to commercial interests and to select Indians, in favor of the imposition of something so nebulous as "retail parity”. A concept, the court might add, that bears no legislative definition or approval and which bears no rational relationship to the purpose of collecting lawful taxes.
Indeed, this venture by petitioner, into the realm of price parity or price regulation, is otherwise improper without legislative enactments determining that these concerns so deeply affect a public interest to warrant the leveling of such price regulations. Similarly, if there is to be a waiver of the imposition of the taxing regulations as utilized herein by petitioner, it is for the State Legislature to enact appropriate and constitutionally correct legislation and, if it deems it necessary, to formally adopt the kind of "Indian or Reservation Agreements” now put forward by petitioner.
*941 Petitioner’s actions, in pressing this "Indian Agreement”, are thus found to be beyond its delegated authority, ultra vires and unlawful.
Although the respondent Indian retailers and the Seneca Nation of Indians are not parties to this "Indian Agreement”, they are, nevertheless, directly impacted, to their detriment, by petitioner’s conduct and the over-all effect this action has had on this entire tax dispute and are entitled to relief set by this court.
Accordingly, these "Indian Agreements” are found to be an unlawful usurpation of legislative power, illegal and unenforceable.
Additionally, this court finds that the actions of petitioner, under the auspices of the Tax Law, namely, to continue a police blockade around those reservations whose tribal governments have yet succumbed and entered the propounded "Indian Agreement”, while otherwise waiving enforcement of the taxing scheme herein for those tribal governments who have so entered into these unlawful "Indian Agreements” amounts to an unequal, selective and unjust enforcement of laws. Owing to the apparent political and/or commercial nature of this conduct, the court further finds that such selective enforcement denies respondents equal protection of laws. (See, US Const 14th Amend; Yick Wo v Hopkins, 118 US 356 [1886]; Matter of 303 W. 42nd St. Corp. v Klein, 46 NY2d 686 [1979]; cf., Matter of New York Assn. of Convenience Stores v Urbach, 230 AD2d 338 [3d Dept 1997].)
Accordingly, this court declines to grant petitioner’s request and will not confirm the temporary seizures at issue herein. Were this court to have ruled that a confirmance was in order, it would, nevertheless, be compelled to recognize, at the final forfeiture hearing, the extraordinary and confusing circumstances precipitating these seizures and thereupon exercise its discretion and dismiss petitioner’s complaint and terminate these forfeitures, in the interest of justice, as provided under Tax Law § 1848 (d) (4) (D).
In light of the above rulings, the court does not reach respondents’ claims of violations to their sovereignty interests, as provided in those treaties to which the State is a signature, and to the extent this issue may hereafter be applicable, it is reserved. Similarly, the tangential issue of the nature of the motor fuel/petroleum business tax as it impacts the individual Indian retailer is not here met and is also reserved for further proceedings, if necessary.
*942 Lastly, until petitioner is able to demonstrate to this court that it is making a good-faith effort to enforce its taxing authority in a uniform manner and with a rational relationship to its intended purpose, or has otherwise compromised this matter, it is directed to remove and is further restrained from implementing that level of police enforcement necessary to carry out the blockading of the Cattaraugus Reservation lands and the interception of product distributors bound for Indian retailers thereon.
In reaching the result herein, this court is hopeful of a lessening of tensions that now exist between the State and Indian reservation retailers and suggests that all parties return to the status quo which preexisted the April 1, 1997 tax imposition deadline set by petitioner.
Obviously, this court wishes to encourage a resolution of the greater issues noted herein, by compromise between the State and tribal interests. To the extent it is able to offer guidance on the issues remaining before this court and the implementation of the court’s directives, counsel are invited to seek further conference with the court.