(127 App. Div. 770.)

## SENECA NATION OF INDIANS v. APPLEBY.

(Supreme Court, Appellate Division, Fourth Department.   July 7, 1908.)

1. INTERNATIONAL LAW—ACQUISITION OF TERRITORY.

   Territory may be acquired by discovery and conquest, and the conquering nation may attach to itself a part of the territory of the nation vanquished and may confiscate the land from the actual owners and occupants.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 29, International Law, § 6.]

2. PUBLIC LANDS—RIGHTS OF INDIANS—GRANTS FROM CROWN.

   In the assertion of title to lands in this country by right of discovery, the interests of the Indians were not recognized, and priority of possession by discovery signifies political mastery and the assertion of title in the land, and the title to lands discovered and acquired by the subjects of Great Britain was in the crown, and settlers became vested by grants from the crown, which grants are recognized as the source of title.

3. SAME—INDIAN LANDS—"PRE-EMPTION" BY STATE.

   The essence of a right of "pre-emption" is the privilege of purchasing, and when settlers occupy public lands, and the government places the same in the market, the settlers have a preference right to purchase at the price stated, and the state, which has acquired the pre-emption in lands occupied by Indians, has the first right to purchase when the lands are put up for sale or to extinguish the Indian title.

   [Ed. Note.—For other definitions, see Words and Phrases, vol. 6, pp. 5496, 5497.]

4. SAME.

   The right of pre-emption of the soil, when applied to the acquisition of Indian lands, may not pass by mere conveyance of the lands described.

5. INDIANS—LANDS—TITLE.

   The interest of Indians in reservation lands is merely one of occupancy, of which they cannot be deprived, except by voluntary cession on their part, approved by the proper civil authorities, and the ultimate title is in the state, or its grantee.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indians, § 28.]

6. SAME.

   By treaty between Massachusetts and New York, ratified by each state and by Congress, Massachusetts ceded to New York all claim "to the government, sovereignty and jurisdiction of" lands described.  New York ceded to Massachusetts, grantees, etc., the right of pre-emption of the soil from the Indians, and all title which New York had.  The treaty provided that Massachusetts might grant the right of pre-emption of the lands to any person, who might extinguish by purchase the claims of the Indians.  Massachusetts claimed title to the lands by virtue of a grant from Great Britain.  *Held* that, whether it be assumed that the title of Massachusetts from Great Britain was valid or not, Massachusetts under the treaty owned the ultimate fee of the lands, and the incidental right of pre-emption and the right of the Indians was possessory only.

7. SAME.

   The right of Indians in lands was possessory only, while Massachusetts owned the fee and the incidental right of pre-emption.  Massachusetts conveyed to a grantee her right and title to the land.  Thereafter the land was reserved to the Seneca Indians.  The grantee subsequently conveyed the same to a purchaser and covenanted that he should hold the same subject only to the right of the Indians.  The Indians and the claimant under the purchaser entered into a treaty, whereby the claimant agreed that the Indians might continue in the occupation of the land reserved with the same title as they possessed, saving to the claimant the

right of pre-emption and all the title which he had. *Held*, that the Seneca Indians recognized that the title of the claimant was of the same effect as that owned by Massachusetts, and his right was not limited to a right to purchase.

8. SAME.

A treaty between the United States and the Six Nations, made after the close of the Revolutionary War, which recites that the Six Nations shall be secure in the possession of the lands they inhabit, which includes land in New York, does not convey any land to the Six Nations, but simply assures the Indians that their lands will not be confiscated by the United States.

9. PUBLIC LANDS—WHAT ARE LANDS OF STATES.

The original 13 colonies were independent sovereignties, and the fee of all the land within their respective domain belonged to the colony where situated, and the United States government did not own it, unless title was acquired by cession from the colony.

10. INDIANS—LANDS—TITLE—"TREATY."

The Indians have not been regarded by the United States as independent nations, and treaties, which are solemn agreements between nations, when made with Indians, have no greater significance than an act of Congress.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indians, §§ 2, 5.

For other definitions, see Words and Phrases, vol. 8, pp. 7085–7087.]

11. SAME.

The Indians are the wards of the nation and of the state, and no one can despoil them of their lands, and any sale by them must be approved by the proper officers.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indians, § 39.]

12. SAME.

The right of Indians to lands was possessory while Massachusetts owned the fee and the incidental right of pre-emption. Massachusetts conveyed the land, and a purchaser held the same subject to the right of the Indians. *Held*, that the Indians could not establish title against the purchaser by adverse possession, since the purchaser could not obtain possession until the Indian title was extinguished, and the statute did not commence to run against him as long as the Indians were in possession.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indians, § 55.]

13. SAME.

The right of the Seneca Nation of Indians to land was possessory, while a purchaser claiming under a conveyance from Massachusetts owning the fee and the incidental right of pre-emption claimed the land subject only to the rights of the Nation. *Held*, that the Seneca Nation could not maintain an action under Code Civ. Proc. § 1638, to compel the determination of the purchaser's claim to the land; but the purchaser could not obtain possession, unless the Nation voluntarily surrendered possession to him, and on the Nation ceasing to exist, the individual Indians might occupy the land with the effect of the possession in their tribal capacity.

Kruse and Robson, JJ., dissenting.

Appeal from Trial Term, Erie County.

Action by the Seneca Nation of Indians against Charles E. Appleby. From a judgment dismissing the complaint, and adjudging that defendant is the owner in fee of the lands in controversy, subject to plaintiff's right of occupancy, plaintiff appeals. Affirmed.

The action was tried before a jury at a trial term in the county of Erie. At the close of the evidence, each side moved for a direction of a verdict, and upon the consent of the parties that the trial judge might direct a verdict, subsequently, in the absence of the jury, the case was considered by the court and later a verdict was directed as follows: "The plaintiff has no cause of

action, and the defendant is the owner in fee of the premises, subject to the right of occupancy of the Seneca Nation of Indians, which right of occupancy will cease only with the dissolution of said nation, or its consent to sell to the owner of the right of pre-emption, and that defendant is possessed of the right of pre-emption of such right of occupancy." Judgment was entered conformably to this direction.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Eugene Van Voorhis and Adelbert Moot, for appellant.
William Harrison and George Waddington, for respondent.

SPRING, J. The plaintiff has long been in the occupancy of the lands in controversy. They comprise two distinct tracts or reservations; one in Cattaraugus county, a strip a mile in width, extending along the Allegany river for about 40 miles and containing 30,469 acres, and known as the "Allegany Reservation," and, the other, extending from Lake Erie eastwardly along the Cattaraugus creek, including lands in Cattaraugus, Chautauqua, and Erie counties, and containing 21,630 acres, and designated the "Cattaraugus Reservation."

The Seneca Nation has its own constitution and form of government with a simple, crude judicial system, all of which have been adopted in compliance with acts passed by the Legislature of the state of New York. The Iroquois Confederacy consisted originally of five tribes or nations of the Indians, the Senecas, Onondagas, Mohawks, Oneidas, and Cayugas, and bore the name of the Five Nations, and when the Tuscaroras were received into the league they were known as the Six Nations. Their home long before the Revolutionary War was in Central New York, extending early in their history from the Hudson to the Genesee river. The men composing the nation were intelligent, but fierce, warlike, and bloodthirsty, and they conquered the Indian tribes surrounding them, carrying their expeditions west to the Mississippi river and south to the Carolinas. The Eries and other tribes at one time inhabited New York State west of the Genesee river, but they were driven from their territory by the relentless Iroquois, and the dominion of the latter extended to Lake Erie. And yet with all the wide extent of their forays, in the height of their conquests, they never exceeded from 15,000 to 18,000 inhabitants and were never able to muster more than 2,000 warriors. Their descendants on reservations in New York and Canada probably number as many as the whole confederacy 150 or 200 years ago. The whole number of Indians east of the Mississippi river never at any one time exceeded the present population of the city of Buffalo. Their constant wars and implacable fighting spirit, their exposure with inadequate clothing in a rigorous climate, and precarious, irregular food supply tended to prevent any increase in numbers. It was the survival of the fittest, for only the sturdiest of their men were able to undergo the privations to which they were subjected. They were not an agricultural people. Warfare was their business. Their occupancy of the lands within their dominion was for hunting and fishing. I cannot find that there was ever any division of land among the various tribes composing the league. It is plain that with only about 15,000 people, men, women, and children, in the extensive region reaching from the Hudson to Lake Erie,

and from Canada to the present Pennsylvania line, there would be very little cultivation of the soil.

The interest of the plaintiff in the reservation lands now occupied by the Indians of the Nation is that of occupancy claimed to be derived from their ancestors. That occupancy, as I have indicated, never was, to any great extent, devoted to the growth of crops or to the improvement of the soil. The land in their custody remained virgin forest, and its condition would probably have remained unchanged, except for the advent of the European settlers. After the white people had discovered this Hemisphere and began to occupy it, a new order of things was manifest. They were the more intelligent and the mightier, and the aboriginal inhabitants had to succumb. The uncivilized always must give way to the superior force of the civilized. The Indian occupancy was soon abridged. The attempts at resistance, at the first bloody and with the hope of expelling the intruders from the lands, in the end yielded to the greater numbers of the white colonists. The result was inevitable. The fertile land of this vast territory was necessary for the habitation of millions of people who were to work for a livelihood and who were dependent upon the products of the soil for their sustenance. The sentimentalist may declaim against this recognition of the right to acquire territory, against the wishes of the original occupants. It was a right founded not merely on superior strength and greater numbers, but upon the aggressive dominancy of civilization when competing with the barbarous and uncivilized. Acquisition of territory by discovery and conquest has always been recognized. The conquering nation may attach to itself a part of the territory of the nation vanquished, and may confiscate the land from the actual owners and occupants. The more humane method has generally obtained of permitting the owners of the land to remain unmolested, while the sovereignty and political control of the successful nation has prevailed over the acquired territory. After the dismemberment of Poland the Poles were not deprived of their holdings or expelled from the country. As a result of the Franco-German War, Alsace and Lorraine became a part of the German Empire; but the occupants of the territory composing these provinces were undisturbed. Those owners were civilized people in possession of defined premises, had made improvements, and cultivated the soil, while the American Indians were not classed among the civilized peoples, and the lack of civilization was due in some degree to their inability to till the land or to earn a livelihood.

When this continent was discovered, there was a sharp strife among the discovering powers to gain supremacy. Priority of possession signified political mastery and the assertion of title in the land. The national standard when raised covered not only the land in sight, but territory unexplored with boundaries unknown to the claimant. The Indian interest in the land was not taken into the calculation. No title was recognized in favor of any tribe of Indians. In Great Britain, the title of the lands discovered and acquired by its subjects was in the crown, and the settlers became vested by grants from his majesty. Those grants have always been recognized as the source of title to the lands in the New England and Middle States. There is no tracing

back of the title to the aboriginal occupants. Their right of occupancy has been purchased or acquired in other ways, until it has disappeared, except where, by the assent of the nation or the state in which the particular reservation is located, they have been segregated and the original claim may there remain, but always that of occupancy.

In 1629 the King of Great Britain granted in fee to the Colony of Massachusetts Bay certain described lands on the Atlantic Coast, and then by a general grant included the lands within the strip across the entire continent and which in its sweep took in Western New York. This grant confirmed a previous grant to the Duke of York which included all the land between the fortieth and forty-eighth degrees north latitude, from sea to sea, and which in its extensive reach covered all the present state of New York. This wholesale appropriation by right of discovery shows the extent of the claim of the first discoverer and possessor. The contiguous lands which were thus acquired embraced all of the continent within the limits expressed, although the boundary lines were not realized nor the magnitude of the appropriated territory comprehended by the presumptuous claimant.

In 1664 Charles II conveyed, by grant, to the Duke of York a large tract of land, which included a portion of the premises embraced in the grant already referred to. I am not able, from the description, to ascertain that any of the lands in Western New York were included in this grant. No matter; the colony of New York succeeding to this title, claimed the entire colony passed by it, and the conflicting claims engendered much ill feeling between the two colonies. For the purpose of adjusting these complications, which had become quite acute, with the increasing importance of the two colonies or states, commissioners were appointed by each of them, and they met at Hartford, Conn., in December, 1786, and entered into a compact which was ratified by the Legislature of each state, and also by Congress shortly after the adoption of the federal Constitution. By the treaty, the commonwealth of Massachusetts ceded to New York State all claim which Massachusetts had "to the government, sovereignty and jurisdiction" of the lands in dispute. New York, on its part, ceded "to the said commonwealth of Massachusetts, and to the use of the commonwealth, their grantees and the heirs and assigns of such grantees forever, the right of pre-emption of the soil from the native Indians, and all their estate, right, title and property (the right and title of government, sovereignty and jurisdiction excepted) which the state of New York hath," which embraced all the lands in Western New York, and which are specifically bounded in the treaty, and extended from the northerly Pennsylvania line to Lake Ontario. The tenth provision is as follows:

"The commonwealth of Massachusetts may grant the right of pre-emption of the whole or any part of the said lands and territories to any person or persons who by virtue of such grant shall have good right to extinguish by purchase the claims of the native Indians, providing, however, that no purchase from the native Indians by any such grantee or grantees shall be valid unless the same shall be made in the presence of and approved by a superintendent to be appointed for such purpose by the commonwealth of Massachusetts, and having no interest in such purchase, and unless such purchase shall be confirmed by the commonwealth of Massachusetts."

It is the contention of the appellant that the commonwealth of Massachusetts, by this treaty and cession, only acquired the pre-emptive right, or the right to buy the land of the Indians whenever they were ready to sell. The right of pre-emption has long been in use in our legal nomenclature, and early in England signified the right to purchase merchandise for the crown. When the settlers occupy the public lands of the United States, cultivating and improving the same, if the government places the lands in the market at a stipulated or minimum price, the settlers so in possession have the right of pre-emption, or a preference in buying the land at the price stated; that is, the essence of a right by pre-emption is the privilege of purchasing, and, as applied to the lands occupied by the Indians, the state which has acquired the pre-emption in these lands has the first right to purchase them when they are put up for sale, or to extinguish the Indian title. Fellows et al. v. Denniston, 23 N. Y. 420, 423. At the time the treaty between New York and Massachusetts was entered into, the right of purchase from the Indians was considered a valuable asset. The Indians were improvident in disposing of their lands. They derived nothing from the soil, and a small sum in hand was alluring to these sons of the forest, for whom manual labor had no attraction.

The claim is vigorously pressed by the appellant's counsel that this tenth provision indicates Massachusetts only possessed the right of purchase. The provision did not pass title to Massachusetts. That had been accomplished in specific terms by the cession clause previously referred to. This tenth provision simply assured the right of that state to sell the pre-emptive right. Massachusetts, of course, could sell and convey the land which it owned. It might, however, be claimed that the right to extinguish the Indian title was connected with statehood and could not be transferred to an individual, and the provision was inserted to make clear its power to part with this right of pre-emption as well as the fee title. I think therefore the cession to Massachusetts was more than the mere right of purchasing lands from the Indians. New York intended to part with all the right or title it had in the lands described, except that of sovereignty and governmental authority. The right of pre-emption of the soil was a peculiar phrase and of known signification when applied to the acquisition of Indian lands and might not pass by a mere conveyance of the lands described, so it was specifically mentioned. The grant, however, in terms included all the estate and title which the state of New York had in the premises. A certain part of the lands in the state of New York was ceded by Massachusetts to the former state, and similar language is employed in vesting the title, and which was in effect an exception or reservation in the deed or grant. The purpose of this compact was to insure to New York the unmolested political authority and dominion of the territory within its domain and to release to Massachusetts any claim or lien held by New York in the premises to which Massachusetts was asserting title or ownership. To limit the interest parted with by New York to the right to purchase was a restriction not within the compass of the grant when the long dispute between the two states is considered. Massachusetts had long asserted that the fee of the lands was in her, for there had been no recognition of fee title in the

Indians. New York made a counterclaim, and certainly set up no title in the Indians. The aborigines were not a factor in the determination of the controversy. Their occupancy was unquestioned, and the tenure of it could not be cut short except by their voluntary relinquishment. The controversy was adjusted by one state yielding sovereignty to the other, while that other surrendered its claim to fee title in the lands described. Each attained its object, and the import of the agreement seems plain, and New York never questioned the extent of the grant.

Passing that, however, Massachusetts had acquired title to these premises by patent from the crown to Massachusetts Bay Colony in 1629, as already shown. The priority of that title is manifest, and it had not been transferred to New York. Even if the grant from New York was limited to the right to purchase from the Indians, Massachusetts still retained the original claim based upon priority of discovery and of grant. It is therefore not of the utmost importance whether Massachusetts acquired the fee title from New York, for she had it by right of discovery from Great Britain, which had been transferred to her grantor before the grant to the Duke of York. Each assertion of title was founded upon the same discoverer's claim, and each took from the crown of the same kingdom. Let us assume, however, that the original title in Massachusetts had for some reason expired, or the description in its grant was too indefinite, and that the grant to the Duke of York in 1664 did not include the lands in Western New York, still New York held the fee title; that is, eliminate entirely the Massachusetts title. When the treaty of peace was consummated with Great Britain in 1783, it relinquished its title and interest in all the lands within the 13 states, and the title passed to each state of all the land within its territory. The boundaries of each state were well defined, and in New York embraced all the land to Lake Erie between the Pennsylvania northerly boundary and Lake Ontario, and it was largely occupied by actual settlers. All this territory had belonged to Great Britain by right of discovery. The only other claimant at any time had been France, and its interest in the lands east of the Mississippi river, except a portion of Louisiana, was ceded to Great Britain in 1763 as a result of the French and Indian or Seven Years' War. New York therefore, at the time of the compact with Massachusetts in 1786, was the absolute owner in fee of this land by a title recognized in all civilized countries and by the courts of our own nation as the supreme indefeasible title, subject only to the title of Massachusetts already referred to. When New York conveyed to Massachusetts, the grantee became vested with the unqualified fee title, aside from her claim based upon precedence of discovery and grant from the crown.

By deed bearing date May 11, 1791, Massachusetts, for the consideration of £15,000 expressed in the deed, conveyed to Robert Morris a tract of land in Western New York containing 800,000 acres and including the lands described in the complaint. The interest transferred is thus set out in the conveyance:

The grantors "do give, grant, bargain, sell and convey to the said Robert Morris, his heirs and assigns forever, the pre-emptive right and all other right

title and interest which the said commonwealth hath to a certain tract or parcel of land being part of the tract and territory above described, which parcel contains about eight hundred thousand acres, more or less, and is bounded as follows, to wit [describing the lands]."

The title acquired by Morris has been continued down to the present owners of this vast tract of land, and its validity as an indefeasible title in fee has too long been recognized to be overturned now.

Morris obtained by purchase from Massachusetts by several similar conveyances other extensive tracts of land in Western New York until he owned 3,600,000 acres. Shortly after he sold and conveyed to the proprietors of the Holland Land Company this large region and agreed in the conveyance to extinguish the Indian title or interest, which he did. In 1797 a commissioner on behalf of the United States, and also of Massachusetts, were present at Big Tree at the long negotiations or conference and assented to the sale. Ten tracts of land comprising 337 square miles were reserved to the Indians, and the Allegany and Cattaraugus reservations were among the number, and the occupancy of the Senecas upon these two tracts has continued since that time with some changes in the boundaries of the Cattaraugus reservation reducing the quantity of the land from that originally reserved. By conveyance dated September 12, 1810, the proprietors of the Holland Land Company conveyed to David A. Ogden about 200,-000 acres of these reservations of land occupied by the Indians, and including the two reservations in question, for 50 cents an acre. The grantors covenanted that they were "seised of an indefeasible estate or inheritance" in the lands conveyed, and that they were authorized to sell the pre-emption right therein, and "that the said party of the second part (Ogden), his heirs and assigns, shall and may at all times hereafter forever, have, hold, occupy, possess and enjoy the above granted and described premises and every part thereof subject only to the right of the native Indians." This was the origin of the defendant's title. Ogden held the legal title until 1821, although apparently not the sole owner during that period. At that time a trust deed was executed by him to certain designated trustees. An association or organization seems to have been formed, and a division of the interests into 20 shares was made, and the name of Ogden Land Company has in general language been since applied to the company or trusteeship. About 1871 the defendant and one Babcock, who died shortly after, were appointed trustees. An action in which all the shareholders were parties was commenced in the Supreme Court, Queens county, in this state, in 1882, and a judgment was entered December 10, 1883, ratifying the appointment of the defendant as trustee, and naming William D. Waddington, now dead, a co-trustee, and the defendant has since acted alone. I will later make some reference to the connection of the Ogden Company with the plaintiff.

The assertion of the title by right of discovery to the exclusion of any ownership of the Indians in the fee of the land has been fruitful in important litigation, and the gravity of the contests and the value of the lands involved have elicited very elaborate and learned opinions from some of the ablest jurists in the nation.

In Johnson and Graham's Lessee v. McIntosh, 8 Wheat. (U. S.) 543,

5 L. Ed. 681, the action was ejectment for land in Illinois. The plaintiffs were the grantees of the premises in suit from a tribe of Indians who at the time of the conveyance were in actual, lawful possession of the premises, and the sale in their behalf was duly authorized. The defendant based his title upon a grant from the United States derivable by letters patent from the King of England early in the seventeenth century. Chief Justice Marshall delivered the opinion of the court. After stating generally that title by discovery was recognized by the various European nations, he proceeded to discuss the relations between the discoverer and the Indians, saying, at page 574 of 8 Wheat. (5 L. Ed. 681):

"In the establishment of these relations, the rights of the original inhabitants were, in no instance, entirely disregarded, but were necessarily, to a considerable extent impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil at their own will, to whomsoever they pleased, was denied by the original fundamental principle that discovery gave exclusive title to those who made it. While the different nations of Europe respected the right of the natives as occupants, they asserted the ultimate dominion to be in themselves, and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in possession of the natives. These grants have been understood by all to convey a title to the grantees, subject only to the Indian right of occupancy. The history of America, from its discovery to the present day, proves, we think, the universal recognition of these principles."

And again, at page 587 et seq. of 8 Wheat. (5 L. Ed. 681):

"The United States, then, have unequivocally acceded to that great and broad rule by which its civilized inhabitants now hold this country. They hold, and assert in themselves, the title by which it was acquired. They maintain, as all others have maintained, that discovery gave an exclusive right to extinguish the Indian title of occupancy, either by purchase or by conquest, and gave also a right to such a degree of sovereignty, as the circumstances of the people would allow them to exercise. The power now possessed by the government of the United States to grant lands resided, while we were colonies, in the crown, or in its grantees. The validity of the titles given by either has never been questioned in our courts. It has been exercised uniformly over territory in possession of the Indians. The existence of this power must negative the existence of any right which may conflict with and control it. An absolute title to lands cannot exist, at the same time, in different persons, or in different governments. An absolute must be an exclusive title, or at least a title which excludes all others not compatible with it. All our institutions recognize the absolute title of the crown, subject only to the Indian right of occupancy, and recognize the absolute title of the crown to extinguish that right. This is incompatible with an absolute and complete title in the Indians."

And finally, at page 591 of 8 Wheat. (5 L. Ed. 681):

"However extravagant the pretension of converting the discovery of an inhabited country into conquest may appear, if the principle has been asserted in the first instance, and afterwards sustained, if a country has been acquired and held under it, if the property of the great mass of the community originates in it, it becomes the law of the land, and cannot be questioned. So, too, with respect to the concomitant principle that the Indian inhabitants are to be considered merely as occupants, to be protected, indeed, while in peace, in the possession of their lands, but to be deemed incapable of transferring the absolute title to others. However this restriction may be opposed to natural right, and to the usages of civilized nations, yet, if it be indispensable to that sys-

tem under which the country has been settled, and be adapted to the actual condition of the two people, it may perhaps, be supported by reason, and certainly cannot be rejected by courts of justice."

I have quoted fully from this exhaustive and luminous opinion for the reason that it is the leading one on this interesting subject and has been the accepted doctrine in that court. The Cherokee Nation v. State of Georgia, 5 Pet. (U. S.) 1, 48, 8 L. Ed. 25; Martin et al. v. Waddell, 16 Pet. 367, 426, 10 L. Ed. 997; U. S. v. Cook, 19 Wall. (U. S.) 591, 22 L. Ed. 210; Francis v. Francis, 203 U. S. 233, 238, 27 Sup. Ct. 129, 51 L. Ed. 165. The text-writers have given expression to the same views. Kent's Commentaries, vol. 3, p. 379 et seq.; Washburn on Real Property, vol. 3 (3d Ed.) p. 164 et seq.

The two principles that the Indian interest in the reservation lands is merely one of occupancy which is full, complete, and effective, and of which they cannot be deprived except by voluntary cession on their part and when duly approved by the proper civil authorities, and further that the ultimate title is in the state or its grantee, are well established by the decisions in our own state. Strong v. Waterman, 11 Paige, 607; Fellows v. Denniston, 23 N. Y. 420, 423; Howard v. Moot, 64 N. Y. 262, 271; Smith et al. v. City of Rochester, 92 N. Y. 463, 476, et seq., 44 Am. Rep. 393; Seneca Nation v. Christie, 126 N. Y. 122, 27 N. E. 275. The validity of the title derived from the state of Massachusetts of these lands in Western New York was upheld in the last case cited. The court in commenting on the questions heretofore adverted to, use this language, at page 135 et seq. of 126 N. Y., and page 278 of 27 N. E.:

"The nature of the Indian title to lands on this continent was established by the system of public law adopted by European nations regulating their possessions here. It became the recognized principle that discovery, followed by possession, vested in the sovereign by whose subjects the discovery was made the absolute title to the soil of the lands within the limits of the discovered territory, subject, however, to the right of occupation by the Indian tribes, which could only be extinguished by their voluntary consent, unless forfeited under the laws of war. It was a necessary sequence to the claim that the sovereign had the ultimate title to the soil, that the right to extinguish the Indian occupation was exclusively vested in the sovereign. The Indians were held to be incapable of alienating their lands except to the crown, and all purchases made from them without its consent were regarded and treated as absolutely void. The title of the crown was subject to grant, but a grant from the crown only conveyed the fee subject to the right of Indian occupation, and, when that was extinguished under the sanction of the crown, the possession then attached to the fee, and the title of the grantee was thereby perfected. These general principles were announced by Chief Justice Marshall in the great case of Johnson v. McIntosh, 8 Wheat. (U. S.) 543, 5 L. Ed. 681, which has ever since been regarded as a sound exposition of the nature of Indian titles."

The leading case relied upon by the counsel for the appellant is Ogden v. Lee, 6 Hill, 546. The plaintiffs in that case, who were the trustees of the Ogden Land Company, recovered a verdict in an action of trover against the purchaser of saw logs cut and removed from the Cattaraugus reservation, and the Supreme Court granted a new trial. The right of the Indians to use and develop these lands to the fullest extent by virtue of their occupancy thereof must be clear. They are not in by a definitely determinable term. Their possession is not that

of a tenant, but to all intents and purposes during their occupancy they are the owners. The possession can only be ended by their relinquishment of it. It was doubtless expected that their occupation would be perpetual, and it has existed for more than 100 years upon these reservations and with no diminution in the number of the Indian occupants. The principles ordinarily applicable to a tenant in possession cannot be applied to these Indians in view of the permanency and peculiar character of their occupancy. The Indians who sold the logs were in possession of the premises, and for aught that appeared the primary purpose in their cutting was to improve the land, and, if so, they certainly had a right to fell trees and dispose of them. United States v. Cook, 19 Wall. (U. S.) 591, 22 L. Ed. 210. The court did in its remarks limit the cession by New York to Massachusetts to the right of pre-emption in the soil; but the expressions were not necessary to the decision of the case. The judgment was affirmed in Fellows v. Lee, 5 Denio, 628; the court holding "that the Indian title to the lands is an absolute fee," and the state of Massachusetts only acquired the right to purchase whenever the Indians decided to sell. There are other cases cited upon the brief of the appellant's counsel, like Wadsworth v. Buffalo Hydraulic Association, 15 Barb. 83, and Blacksmith v. Fellows, 7 N. Y. 401, in which it has been held either that the Indians have an absolute title in fee, or that the state of Massachusetts only acquired from New York the right to buy of the Indians in case they concluded to dispose of their lands. In some of the cases the expressions used upon these questions were not essential to the decision arrived at. In any event, I am satisfied that the trend of authority and of reasoning is decidedly in favor of the position that the Indians' right is possessory only in these lands, and that Massachusetts by discovery and consequent grant from the crown and by cession from New York owned both the ultimate fee title and the incidental right of pre-emption, and its title and rights were transferred to the predecessors of the defendant.

There are other phases of the case which it may be advisable to advert to. On January 15, 1838, the Seneca Nation conveyed to the then trustees of the Ogden Land Company all their rights in their several reservations in Western New York, including the Allegany and Cattaraugus, in consideration of the payment of $202,000. This conveyance was in pursuance of a treaty at which representatives of the national government and of Massachusetts were present and approved of the transaction. The compact was the result of negotiations whereby the Indians were to be transported to a more extensive reservation for them in what is now the state of Kansas, and one of the inducements to the United States for the sale and the extinguishment of the Indian occupancy and interest in this state was the cession to the United States of lands in Wisconsin adjacent to Green Bay. The Indians were to have at least five years in which to vacate the reservations. The General Council of Massachusetts ratified the transfer. The Senate of the United States, however, made substantial modifications in the plan contemplated, and, as amended, approved of the treaty subject to the "full and voluntary consent" of each of the tribes "separately assembled in council" after a fair explanation of the treaty,

with the amendments, had been given to them by a commissioner of the United States. Pending the attempted compliance with these provisions, complaint was made that the Indians had been defrauded or overreached in the transaction, and the result was another treaty dated May 20, 1842, on behalf of the Ogden Land Company and the plaintiff, whereby the company transferred to the latter the Allegany and Cattaraugus reservations, and the plaintiff gave up to the company two other reservations. The significance of the treaty to the present discussion is in the following article contained in it:

"Article 1. The said Thomas Ludlow Ogden and Joseph Fellows, in consideration of the release and agreements hereinafter contained on the part of the said Seneca Nation, do on their part consent covenant and agree, that they, the said Nation (the said indenture notwithstanding), shall and may continue in the occupation and enjoyment of the whole of the said two several tracts of land called the Cattaraugus reservation and the Allegany reservation, with the same right and title in all things as they had and possessed therein immediately before the date of the said indenture, saving and reserving to the said Thomas Ludlow Ogden and Joseph Fellows the right of pre-emption, and all other the right and title which they then had or held in or to the said tracts of land."

The plaintiff thus recognized the outstanding claim of the Ogden Land Company of the same force and effect as that held by the state of Massachusetts, and it was not limited to the right of purchase.

The counsel for the appellant claim that the plaintiff acquired or was assured the title in fee by certain treaties made between the United States and the Six Nations, particularly the one consummated at Ft. Stanwix in this state October 2, 1784.

The Iroquois Nation, excepting the Oneidas and the Tuscaroras, had enlisted with England in the Revolutionary War. They were implacably cruel in their attacks upon the colonists and participated in the bloody battle of Oriskany in their own vicinity and in many other engagements, and constantly carried on a predatory guerilla warfare. The feeling against them among the settlers was quite bitter, and yet the United States were not inclined to treat them as a vanquished enemy, and that is well illustrated in this treaty at Ft. Stanwix, which was in effect a treaty of peace between the United States and the four hostile tribes of the Iroquois after the close of the Revolutionary War and the treaty of peace with Great Britain. The treaty recites that the Six Nations "shall be secured in the peaceful possession of the lands they inhabit," which included the lands west of the Genesee river. The United States did not convey any land to 'the plaintiff or to the Iroquois Nation by this or any of the subsequent treaties. It simply assured the enemy which had been conquered that its lands would not be confiscated or appropriated by the United States, but, on the other hand, its occupancy of these lands would be unmolested. The United States owned no title or interest in these premises. The original 13 colonies were independent sovereignties, and the fee of all the land within their respective domains belonged to the colony where it was situated, and the nation never claimed otherwise. The land comprising the great northwestern country, now the states of Ohio, Indiana, Illinois, Michigan, and Wisconsin, was ceded to the United States by the several states claiming title, notably Virginia, after the adoption of the Constitution, so that the title to that vast tract was

vested in the nation; and that is also true of the enormous territory acquired from France by the Louisiana Purchase, but there was never any cession of land within the boundaries of the original 13 colonies by the states now succeeding to them.

The method of dealing with the Indians was by treaty until 1871, since which time acts of Congress have been substituted. United States v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228. They were not regarded as independent nations (case last cited and Cherokee Nation v. Georgia, 5 Pet. [U. S.] 1, 8 L. Ed. 25); and finally it was so declared by Act Cong. March 3, 1871, c. 120, § 1, 16 Stat. 566; section 2079, Rev. St. U. S.

"Treaties" are solemn agreements between nations. In the dealings with the Indians they had no greater solemnity or significance than an act of Congress, although my attention has not been called to any act of Congress relating to the Indians which was unfair to them or has been violated by the nation. The Indians from an early date have been treated as wards of the nation and of the state. No one can despoil them of their lands, and any sale by them which they attempt to make must be approved by the nation and by the state of Massachusetts as well. The state of New York, as far back as when the Dutch were in control, dealt justly with them, purchasing their interest and seldom endeavoring to deprive them of their holdings. When they were placed upon the reservations, it was expected they would remain there, and, evidently, there was no intention of making them citizens or allowing their occupancy to be terminated unless a more suitable home was provided for them.

Nor can the plaintiff establish title against the defendant by adverse possession. The defendant cannot get possession until the Indian title has been extinguished. The statute does not commence to run against him so long as the plaintiff is lawfully in possession. Flemming et al. v. Burnham et al., 100 N. Y. 1, 8, 2 N. E. 905; Clute v. N. Y. C. & H. R. R. R. Co., 120 N. Y. 267, 273, 2 N. E. 317.

I do not deem it important to discuss the many flaws alleged to exist in the defendant's claim of title. It has been too often approved, and its origin is too remote, to justify any invalidation of it for technical reasons. The defendant is not attempting to interfere with the occupancy of the plaintiff in these reservations. He is merely quiescent, and his title cannot be effective while the Indians live, only by their own action. The Seneca Nation is the attacking party. It is endeavoring to extinguish the claim of the defendant which has been held for nearly 100 years by the trustees of the Ogden Company. If the United States deem it wise to make these Indians citizens, or to permit their lands to be allotted in their entirety and aliened to the white people, then Congress should authorize the purchase of the fee title from the defendant.

The affirmance of the judgment does not establish the proposition that, if the plaintiff becomes disintegrated, the defendant's title will vest in possession at once. Allotment among the individual Indians by the plaintiff has been permitted for a considerable period by the national government. Inheritance is allowed in accordance with the statutes of descent of the state of New York, and conveyances amongst

the Indians are also allowed. It may well be held that even though the nation in its tribal capacity should be dissolved—if the individual Indian holds his land by virtue of this recognized method of allotment—that the occupancy will continue to his most remote descendant. It has been held, in United States v. Cook, 19 Wall. (U. S.) 591, 22 L. Ed. 210 supra, that "possession when abandoned by the Indians, attaches itself to the fee without further grant." It would seem reasonable that the surrender of possession must not only be voluntarily made by the nation, but if the nation crumbles to pieces, and the individual Indians occupy the premises, that their possession will have the full force and effect of the plaintiff in its tribal capacity.

The judgment should be affirmed, with costs.

Judgment affirmed, with costs.

All concur, except KRUSE, J., who dissents in an opinion in which ROBSON, J., concurs.

KRUSE, J. (dissenting). The question here is not merely what rights the crown grants purported to grant and convey, but also to what extent they were finally recognized in the adjustment of the conflicting claims, between those claiming under the crown grants and the Indians, who claimed in hostility thereto. Regardless to whatever right to the lands in question either Massachusetts or New York, or both, may have apparently acquired through the crown grants, I think it quite clear that the federal government in dealing with the Indians, as well as both states, ultimately recognized that the Indians were the owners of the lands now in controversy for all practical purposes, having the full and exclusive right to use, occupy, and enjoy the same. Moreover, I think our own courts have so recognized and declared the rights of the Indians in these lands. Ogden and Fellows v. Lee and Ellsworth, 6 Hill, 546, affirmed in the Court of Errors in 5 Denio, 628; Wadsworth v. Buffalo Hydraulic Association, 15 Barb. 83.

In the first case cited, the rights under these respective claims were directly in controversy, and it was there held that the Indian title to the lands is an absolute fee, and that the right of pre-emption conceded to Massachusetts is simply a right to acquire by purchase from the Indians their ownership of the soil, whenever they choose to sell it. That was the final adjudication of the Court of Errors in that case. The Indians have been upheld in doing acts upon their lands, compatible only with the right of ownership thereof, such as the cutting of timber and disposing of the same, as was done in the case of Ogden and Fellows v. Lee and Ellsworth, supra, and the taking of oil and gas from the lands, as is now being done with the sanction of the federal government. While the federal government does not permit the Indians to dispose of their lands without its consent, that is simply because they are regarded as wards of the nation, incompetent to take care of themselves, and to prevent them from being imposed upon and defrauded by the unscrupulous and dishonest.

The pre-emptive right is in no sense an estate in lands. It is merely the first right to purchase. But assuming that this pre-emptive

right carries with it, and this Ogden title includes, the fee, it is a mere naked and technical fee, and, even in that view I think the judgment does not truly and correctly declare the rights of the respective parties in these lands. The judgment rests upon the conclusion that the entire right, estate, and title in and to the lands is in two parties, the Indians and the owners of the Ogden title. It apportions the rights between them by declaring that the defendant is the owner in fee of the premises, subject to the right of occupancy of the plaintiff, the Seneca Nation of Indians, which right of occupancy will come only with the dissolution of said nation or its consent to sell to the owner of the right of pre-emption, and that the defendant is possessed of the right of pre-emption of the right of occupancy. The effect of this judgment is that the Indians have no estate in the lands—merely the right to occupy the same, dependent upon their keeping intact their tribal relation. That is, when their tribal relation is dissolved, the owners of the Ogden title become the absolute owners of the Indian lands, and this may occur at any time, since the policy of the state, as well as the nation has been to favor allotments of lands to individual Indians, and to encourage them in following pursuits and adopting habits of civilized life, the effect of which is naturally and necessarily the disintegration of the Indians as a nation and the dissolution of their tribal relation. This, I think, is not in accordance with the treaties made with the Indians, nor in keeping with assurances given them by the agents and officers of the federal government. Very early in our history as a nation (December 27, 1790), George Washington, our first President, in reply to Corn Planter, Half-Town, and Great Tree, representing the Seneca Nation of Indians, said:

"I, the President of the United States, by my own mouth, and by a written speech signed with my own hand and sealed with the seal of the United States, speak to the Seneca Nation and desire their attention and that they would keep this speech in remembrance of the friendship of the United States."

He then refers to grievances of the Indians, saying that the evils of which they complain arose before the present government of the United States was established, that the case is now entirely altered, that the general government only has the power to treat with the Indians, assuring them that the general government will protect them in all the lands secured to them, saying:

"You have said in your speech that the game is going away from among you, and that you thought it the design of the Great Spirit that you should till the ground, but before you speak upon this subject you want to know whether the Union mean to give you any land to till. You now know that all the lands secured to you by the treaty of Ft. Stanwix, excepting such parts as you may since have fairly sold, are yours, and that only your own acts can convey them away."

And then he closes with the admonition to the Indians to continue to be strong in their friendship for the United States and to rely upon their kindness and protection, saying that an agent will soon be appointed to reside in some place convenient to the Senecas and Six Nations, who will represent the United States, and finally assures them that the United States will be true and faithful to their engagements.

"The land is yours," said the President, and I think the treaties and status of the Indians at that time justify the declaration. The judgment under consideration declares directly to the contrary, viz.: That others own the land. They may stay there and occupy the same, but not after their dissolution as a nation.

I do not think that the decision in the case of the Seneca Nation of Indians v. Christie, 126 N. Y. 122, 27 N. E. 275, is at variance with this view or with the earlier decisions referred to. The decision in the Christie Case, which was decided adversely to the Indians, does not rest alone upon the rights acquired through the state of Massachusetts, but upon the Indian title as well. In that case it appeared that the Indians had joined in the conveyance, and that the money had been paid for their benefit. The Indians claimed that they had not parted with their title, while the court held to the contrary, or, at least, that the Indians could not now question the title, which they were attacking.

I think we ought to follow these earlier decisions, until our Court of Appeals or the federal Supreme Court overrules them. Entertaining these views, I must withhold my concurrence to affirm this judgment.

ROBSON, J., concurs with KRUSE, J.